

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 AUG 28  PM 2:52

LORETTA G. WHYTE
CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBIE J. WAGANFEALD and<br>PAUL W. KUNKEL, JR.<br><br>        Plaintiffs,<br><br>  versus<br><br>CITY OF NEW ORLEANS,<br>MAYOR C. RAY NAGIN, ORLEANS<br>PARISH CRIMINAL SHERIFF<br>MARLON N. GUSMAN, OPCSO CHIEF DEPUTY<br>WILLIAM C. HUNTER, OPCSO WARDEN GARY<br>BORDELON, NEW ORLEANS POLICE<br>DEPARTMENT FORMER SUPERINTENDENT<br>EDDIE COMPASS, NOPD CAPTAIN KEVIN<br>ANDERSON, NOPD LT. JOHN DOE, NOPD SGT.<br>JOHN DOE  and NOPD OFFICERS JOHN DOE<br>1 and 2<br><br><br>        Defendants. | CIVIL ACTION<br>NUMBER:<br><br>**06 - 5036**<br><br>SECTION:<br><br>JUDGE **SECT. SMAG.4**<br><br>MAGISTRATE<br><br>CIVIL RIGHTS<br><br>Under 42 USC 1983 and<br>1988<br>JURY TRIAL REQUESTED |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

For their Complaint against Defendants, Plaintiffs Robie J. Waganfeald and Paul

W. Kunkel, Jr. state as follows:

*350⁰⁰*
*WP 7sMs*

1

## I. INTRODUCTION

1.      Plaintiffs make the allegations contained herein based upon knowledge as to their own acts and those of the Defendants, and upon information and belief.  Plaintiffs bring this action against the Defendants for damages arising out of Defendants' false arrest, false imprisonment and unlawful and inhumane confinement of Plaintiffs in the Orleans Parish jail preceding and during the events surrounding Hurricane Katrina, due to the unlawful and unconstitutional acts and omissions described herein.   A jury trial is requested.

## 2. JURISDICTION AND VENUE

2.      This action arises under the Constitution of the United States, particularly the First, Fourth, Sixth, Eighth, Ninth and Fourteenth Amendments to the Constitution of the United States, and under the laws of the United States, particularly the Civil Rights Act, 42 U.S.C. 1983 and 42 U.S.C. 1988.

3.      The jurisdiction of this Court is invoked under the provisions of 28 U.S.C. 1331 and 28 U.S.C. 1343.  The jurisdiction of this Court is invoked as well with regard to diversity of the parties under the provisions of 28 U.S.C. 1332, as the Plaintiffs are residents of a state different from that of any Defendant and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.      Venue is placed in this district as it is the place where one or all of the Defendants reside and where a substantial part of the events and/or omissions giving rise to this action occurred.

5.     Plaintiffs also invoke pendant jurisdiction of this Court over their state constitutional and statutory claims against Defendants pursuant to 28 U.S.C. 1367 as the state law claims form part of the same case or controversy.

### 3. PARTIES

6.     Plaintiff Robie J. Waganfeald ("Waganfeald") is a person of the full age of majority. At all times mentioned herein, Plaintiff Robie J. Waganfeald ("Waganfeald") was a resident of Ohio.

7.     Plaintiff Paul W. Kunkel, Jr., ("Kunkel") is a person of the full age of majority. At all times mentioned herein, Plaintiff Paul W. Kunkel, Jr. ("Kunkel") was a resident of Ohio.

8.     Defendant City of New Orleans ("City"), is a political subdivision located in the State of Louisiana and a municipal corporation, which was at all relevant times the employer of the New Orleans Police Department ("NOPD") chiefs, supervisors and officers named as defendants herein and the Mayor, defendant C. Ray Nagin.  Defendant City is directly liable for the acts complained of herein due to its policies, practices, procedures and customs including those of its police department and its employees, as set forth herein.  It is also responsible for the hiring, training, discipline, supervision and control of the NOPD chiefs, supervisors and officers who are defendants herein. Defendant City is vicariously liable under state law for the actions of its employees as set forth herein.

9.     Defendant C. Ray Nagin ("Nagin") is a person of the full age of majority and is a resident of the Eastern District of Louisiana. At all times pertinent herein, Defendant

Nagin was the duly elected Mayor of the City of New Orleans. Defendant Nagin was responsible for the supervision, administration, policies, practices, and customs for the City of New Orleans and its police department as further described herein, and in particular with regard to evacuation plans for defendant City. He was responsible for the hiring, training, discipline, supervision and control of the NOPD chiefs, supervisors and officers who are defendants herein, including Defendant then-Superintendent of the NOPD, Eddie Compass. He was responsible to insure that the constitutional and statutory rights of persons arrested on minor municipal charges were protected, especially in the face of the serious dangers posed by Hurricane Katrina and its aftermath. He was a final policymaker. He is sued both individually and in his official capacity as the Mayor of the City of New Orleans.

10.     Defendant Marlin N. Gusman ("Gusman") is a person of the full age of majority and is a resident of the Eastern District of Louisiana. At all times pertinent herein, he was the Criminal Sheriff of Orleans Parish and, as such, was responsible for the hiring, training, supervision, discipline and control of the deputies, wardens and employees under his command. He was also responsible for the supervision, administration, policies, practices, procedures, customs and operations of the Orleans Parish Criminal Sheriff's Office ("OPCSO") and its facilities. He was a final policymaker. He is also liable vicariously under state law for the actions of employees of the OPCSO, as complained of herein. He is sued both individually and in his official capacity as the Criminal Sheriff of Orleans Parish.

11.    Defendant Gary Bordelon ("Bordelon") is a person of the full age of majority and is a resident of the Eastern District of Louisiana. At all times described herein, he was an employee of the OPCSO and was the Warden of Templeman III, a jail facility operated by the OPCSO, As such, he was responsible for the policies, practices, procedures, customs and operations of that facility and the supervision, training, discipline and control of those deputies under his command.  He is sued individually and in his official capacity.

12.    Defendant William C. Hunter ("Hunter") is a person of the full age of majority and is a resident of the Eastern District of Louisiana. At all times described herein, he was an employee of the OPCSO, was Chief Deputy and was the Warden of the Intake and Processing Center (IPC), the booking and processing center for the Orleans parish jail, operated by the OPCSO, As such, he was responsible for the policies, practices, procedures, customs and operations of that facility and the supervision, training, discipline and control of those deputies under his command. He is sued individually and in his official capacity.

13.    Defendant Eddie Compass ("Compass") is a person of the full age of majority and is a resident of the Eastern District of Louisiana.  At all times pertinent herein, he was the Superintendent of Police of the New Orleans Police Department ("NOPD").  Defendant Compass was responsible for the supervision, administration, policies, practices, customs and operations of the NOPD, as further described herein, and in particular with regard to the policies, practices, procedures and operations of the NOPD in preparation for Hurricane Katrina. He was responsible for the hiring, training, discipline, supervision and control of the NOPD supervisors and officers who are

5

defendants herein, He was responsible to insure that the constitutional and statutory rights of persons charged with minor municipal offenses were protected, especially in the face of the serious dangers posed by Hurricane Katrina and its aftermath. He was a final policymaker for the City of New Orleans with regard to police policies, practices, procedures, customs and operations. He is sued individually and in his official capacity.

14.    Defendant Captain Kevin Anderson ("Anderson") is a person of the full age of majority and is a resident of the Eastern District of Louisiana.   At all pertinent times herein, defendant Anderson was a supervisory officer with the NOPD, in command of the Eighth District which included the French Quarter area of the City of New Orleans. He was responsible for the training, discipline, supervision and control of the NOPD supervisors and officers under his command including those who are defendants herein. He is sued in his individual and official capacity.

15.    Defendant NOPD Lt. John Doe, ("Lt. Doe") is a person of the full age of majority and, on upon information and belief, is a resident of the Eastern District of Louisiana.   At all pertinent times herein, defendant Lt. Doe was a supervisory officer with the NOPD and was the supervisor of defendants NOPD Sgt. John Doe and NOPD Officers John Doe 1 and 2.  He is sued in his individual and official capacity.

16.    Defendant NOPD Sgt. John Doe, ("Sgt. Doe") is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana. At all pertinent times herein, defendant Sgt. Doe was an employee of the City of New Orleans, a supervisory officer with the NOPD and was the supervisor of defendant NOPD Officers John Doe 1 and 2.  He is sued in his individual and official capacity.

17.     Defendant NOPD Officers John Doe 1 ("Officer Doe 1) and John Doe 2, ("Officer Doe 2") are persons of the full age of majority and, on information and belief, are residents of the Eastern District of Louisiana.  At all pertinent times herein, defendants John Doe 1 and John Doe 2 were employees of the City of New Orleans, serving as police officers with the NOPD.  They are each sued in their individual and official capacity.

18.     At all times pertinent herein, the defendants named herein were acting under color of law and in the course and scope of their employment.

19.     The identity of defendants Lt. Doe, Sgt. Doe and Officers Doe 1 and 2 are currently unknown to Plaintiffs, despite diligent efforts to ascertain their identities. Each of these defendants is well aware of each of their own acts and omissions in this matter, as are the other City of New Orleans defendants, and their identities are known to the named City of New Orleans and OPCSO defendants.

20.     At all pertinent times herein, the defendants knew, must have known and/or should have known of the imminent danger posed by Hurricane Katrina, yet the defendants failed to take reasonable, adequate or necessary steps to insure that the constitutional and statutory rights of the plaintiffs as described herein, would be protected and not violated.

## 4. FACTS

21.     On the evening of Friday, August 26, 2005, Plaintiffs Robie J. Waganfeald and Paul W. Kunkel, Jr., were returning home to Ohio from an extended driving cross-country vacation.   They were en route from Houston, Texas to Toledo, Ohio.   At approximately 11:00 p.m., they decided to stop for the night in New Orleans before

continuing their journey home the next morning on August 27th.  Plaintiffs were aware of

the approaching hurricane and planned to be far north of its path the following day.

22.     Plaintiffs checked into their motel in New Orleans shortly before midnight on

the evening of August 26, 2005.  Like many tourists who visit New Orleans, they decided

to go to the French Quarter, arriving there sometime after 1:00 a.m. on August 27, 2005.

They spent several hours in the Quarter, walking around, visiting various establishments

for food and drink and taking in the sights and sounds of this active street environment.

23.     Shortly after 5:00 a.m. on Saturday, August 27, 2005, as plaintiffs were

walking in the French Quarter, they were accosted by defendants NOPD Officers John

Does 1 and 2 and were falsely accused of being publicly intoxicated.  Plaintiffs were not

publicly intoxicated and so advised defendant Does 1 and 2.

24.     Defendants NOPD Officers Doe 1 and Doe 2  falsely arrested the plaintiffs

for public intoxication, took them into custody rather than issuing a summons, and failed

to take any steps to record or preserve potential physical evidence by performing or

offering to perform any scientific tests to measure the amount of alcohol the plaintiffs had

allegedly consumed. No probable cause existed to form the basis for arrest.

25.     The defendants NOPD Sgt. John Doe, NOPD Lt. John Doe and NOPD

Captain Kevin Anderson, were supervisors, in the chain of command over defendants

NOPD Officers Doe 1 and Doe 2 and knew, must have known or should have known of

the actions of those defendants. These supervisory officers had the duty and opportunity

to intervene to prevent said actions and failed to do so. They also condoned, ratified and

approved of the actions taken by the defendants NOPD Officers Doe 1 and 2 and of each of their subordinate officers in approving said actions.

26.     The defendant NOPD supervising officers also knew, must have known or should have known of the imminent danger posed by Hurricane Katrina and the substantial likelihood that plaintiffs would not be afforded access to bail, phone calls, counsel or courts as required by law.  Nevertheless the plaintiffs were arrested and taken to jail instead of issuing a summons which was within the discretion of the police department defendants.

27.     Following the arrest of the plaintiffs, they were taken to the Orleans Parish jail ("OPP") for processing.  Although the plaintiffs were arrested on municipal charges only, the City of New Orleans did not operate or maintain its own jail, but instead had an arrangement or agreement with the defendant Gusman and the Orleans Parish Criminal Sheriff's Office (OPCSO) for custody, processing and handling of persons arrested on municipal and traffic court offenses.

28.     Due to policies, practices, procedures and customs of defendants City of New Orleans, Nagin and Compass, even under normal circumstances many individuals charged with municipal and traffic offenses who could have been issued summons, were instead arrested and taken into custody.  As a result, the City of New Orleans had one of the highest incarceration rates of any city in the United States and the OPP had grown into one of the largest jails in the country, a size grossly disproportionate to the population of the City. At all pertinent times herein, the OPCSO was housing approximately 7000 prisoners, which included municipal, traffic, state and federal pre-trial detainees as well as

convicted prisoners.  The majority of these prisoners were persons held on municipal or misdemeanor charges.

29.    The defendants City, Nagin and Compass knew, must have known or should have known that the policies, practices, procedures and customs of confining  in the jail large numbers of persons arrested on municipal and traffic court offenses made it extremely difficult, if not impossible, for the constitutional and statutory rights and safety and well-being of those persons so confined, to be adequately or reasonably cared for and protected, especially in circumstances where a hurricane was imminent and where evacuation and removal to a safe place might be necessary. Despite having that knowledge, the defendants City, Nagin and Compass failed to take any reasonable or adequate measures to insure that the rights, safety and well-being of the plaintiffs and others similarly situated would be protected.

30.    At all pertinent times herein, the defendant City had no weekend magistrates or judges available or assigned to conduct probable cause determinations within 48 hours of arrest for persons arrested without a warrant on municipal and/or traffic court offenses, despite clearly established law requiring same. The defendants City, Nagin and Compass knew, must have known or should have known that any individual arrested in the early morning hours on a Saturday on a municipal charge without a warrant would not have a probable cause determination made within 48 hours of arrest, however, these defendants failed to take any steps to insure that such a determination would take place.

31.     Defendants City, Nagin and Compass also knew, must have known or should have known that it was highly unlikely if not impossible, that any persons arrested on a municipal charge without a warrant on early Saturday morning August 27, 2005, in the face of Hurricane Katrina, would have a probable cause determination or bail and counsel hearing within the time limits established by law, yet they failed to take any steps to address this problem.

32.     Upon being transported to the Orleans Parish jail, the plaintiffs were booked and processed through the Intake and Processing Center (IPC), which was under the control and supervision of defendants OPCSO Criminal Sheriff Marlon N. Gusman and Chief Deputy William C. Hunter. While at IPC plaintiffs were denied access to a telephone and were therefore unable to make arrangements for their release on bail or to contact family or counsel or a court to make arrangements for their release.  On information and belief, due to the imminent arrival of Hurricane Katrina, access to telephones at IPC for all newly arrested persons, including plaintiffs, was cut off, for which defendants Gusman and Hunter were responsible.

33.     In addition, defendants Gusman and Hunter knew, must have known or should have known that the defendant City had no weekend magistrates or judges available or assigned to conduct probable cause determinations within 48 hours of arrest for persons arrested without a warrant on municipal and/or traffic court offenses, despite clearly established law requiring same. The defendants Gusman and Hunter knew, must have known or should have known that any individual arrested in the early morning hours on a Saturday would not have a probable cause determination made within 48 hours of

arrest, however, these defendants failed to take any steps to insure that such a determination would take place or that, in lieu of such a determination, the individual would be released from custody.

34.     Defendants Gusman and Hunter also knew, must have known or should have known that it was highly unlikely, if not impossible, that any persons arrested on a municipal charge without a warrant on early Saturday morning August 27, 2005, in the face of Hurricane Katrina, would have a probable cause determination or bail and counsel hearing within the time limits established by law.

35.     The Orleans Parish Criminal Sheriff's office, defendants Gusman and Hunter and the former Orleans Parish Criminal Sheriff, Charles C. Foti, Jr., have all been sued or been aware of prior lawsuits against the Orleans Parish Criminal Sheriff for failing to release persons arrested without a warrant who did not have a probable cause determination within 48 hours of arrest or determination of bail and counsel within 72 hours of arrest.  They were also well aware of their constitutional and statutory obligations in this regard. Regardless, the defendants Gusman and Hunter failed to take any reasonable or adequate steps to insure that the rights of persons in these situations would be protected.

36.     The plaintiffs were subsequently housed in the building known as Templeton III located in the OPP complex and again not permitted to make a phone call despite frequent requests. Defendant Gary Bordelon was the Warden of Templeman III. On information and belief, due to the imminent arrival of Hurricane Katrina, access to

telephones at Templeman III for all newly arrested persons, including plaintiffs, was cut off, for which defendants Gusman and Bordelon were responsible.

37.     As a result, the plaintiffs were denied access to a telephone and thereby were prohibited from arranging bail, obtaining counsel or arranging access to a court with jurisdiction that could order their release.

38.     Defendants Gusman, Hunter and Bordelon knew, must have known or should have known that telephone access was being denied to newly arrested persons and that denial of that access would prevent those persons, including plaintiffs, from having access to bail, to counsel and to the courts, or to make any arrangements to obtain their release from confinement.

39.     Despite being in custody on a warrantless arrest, there was no probable cause determination for the plaintiffs' arrests within 48 hours of arrest and there was no reasonable likelihood that they would have a timely probable cause determination, facts which were known, must have been known or should have been known to defendants Gusman, Hunter and Bordelon, yet they failed to take any steps to release the plaintiffs from custody.

40.     The plaintiffs were not brought before any judge or magistrate within 72 hours of their arrest for the purpose of appointment of counsel and determination of bail, and there was no reasonable likelihood that they would have a timely hearing on these matters, facts which were known, must have been known or should have been known to defendants Gusman, Hunter and Bordelon, yet no steps were taken to release the plaintiffs from custody.

41.   Defendant Gusman knew, must have known or should have known that he was obligated, by law, to release from custody any individual arrested without a warrant for whom there was not a probable cause determination by a magistrate within 48 hours and any arrested person who did not appear before a magistrate for a determination of bail and counsel within 72 hours of arrest.

42.   Defendant Gusman failed to establish policies, practices, procedures or customs to insure that the constitutional and statutory rights described herein, of arrested persons such as the plaintiffs, would be honored.

43.   Based upon information and belief, the amount of bail for the offense alleged against each of the plaintiffs, i.e., public intoxication, is routinely $300.00, which was an amount which the plaintiffs could have easily posted, but they were never given an opportunity to post bail, to contact counsel, family or a court.

44.   On Saturday, August 27, 2005, at 5:00 p.m. a voluntary evacuation order was made by defendants City of New Orleans and Nagin, due to the approach of Hurricane Katrina, a then Category 5 hurricane, moving toward the Louisiana coast with extremely high winds, rain and potential storm surges of over twenty feet.

45.   Despite the serious dangers posed by this imminent and extremely dangerous hurricane, defendants City, Nagin and  Gusman failed to take any actions to release persons charged with minor municipal offenses, such as the plaintiffs, or to insure that those persons had access to bail, counsel or a court in order to obtain their release. No evacuation of the prisoners of Templeton III was planned or conducted and plaintiffs

remained as detainees in Templeton III, without access to telephones or the ability to send messages to communicate with family, friends, counsel or a court in any manner.

46.    On Sunday, August 28, 2005, at 9:30 a.m. a first-time ever mandatory evacuation order was given for the City of New Orleans by defendants City and Nagin.

47.    The mandatory evacuation order given on August 28, 2005, excluded essential personnel and inmates despite knowledge on the part of the defendants of the magnitude and catastrophic nature of the approaching storm.  The defendants were well aware of the potential damage to life and property that this storm posed.  They were also aware that there were numerous persons in the position of plaintiffs, newly arrested on minor municipal offenses, who were without access to phones, bail, courts or counsel and who could have easily been ordered released.  They were also aware that the continued detention of these persons would necessarily result in the violation of substantial civil and constitutional rights of those persons.

48.    Both Defendant Nagin and Defendant Gusman had the authority and power to order the release, on recognizance, of any individuals arrested on municipal or traffic offenses including plaintiffs, but they chose not to.  Instead, they acted in conscious  and deliberate disregard for the protection of plaintiffs' rights, safety, security and well-being.

49.    Defendants City, Nagin and Gusman knew, must have known or should have known that given the enormous threat posted by Hurricane Katrina to the City of New Orleans,  there was inadequate food and water, staffing, emergency equipment and resources to provide a safe, secure and humane environment for persons detained at the Orleans Parish jail.

50.     Still throughout the day on Sunday, August 28, 2005, no evacuation of the prisoners of the Orleans Parish jail was conducted and the plaintiffs remained in custody and detained within the OPP without access to telephones or any means of communication with family, friends or counsel. During the entire time they were in custody at OPP, as described herein, they were never able to obtain access to a telephone or any means of communication with the outside world.

51.     During the early hours of Monday, August 29, 2005, Hurricane Katrina, now a massive Category 3 hurricane, struck the City of New Orleans with devastating force. There were major canal levee breaks throughout the City, in particular, the Industrial, London and 17th Street canals and flood waters began to flow into the City.  The possibility that there would be severe flooding in the event of a major hurricane event in the City of New Orleans and the possible devastating events which could flow from such an occurrence, was known, must have been known or should have been known to defendants City, Nagin and Gusman yet they failed to take reasonable or adequate steps to insure the rights, safety and wellbeing of persons held at OPP, with terrible and horrific consequences to the detainees, including the plaintiffs, as well as OPCSO employees and their families and loved ones.

52.     As flooding began in the OPP buildings, OPCSO deputies locked down plaintiffs in their cells.  As the flood waters continued to rise on the first floor, the plaintiffs were separated. Plaintiff Waganfeald was moved to a gymnasium on the second floor of the jail complex and locked inside an overcrowded gym containing more than 125 inmates without food, water, light or toilet facilities.  Plaintiff Kunkel, along with five other

inmates, was moved to a standard-sized cell on the second floor and was locked down and was likewise without food, water, light or toilet facilities.

53.    The jail officers and deputies then left their posts and abandoned the inmates, including the plaintiffs. Defendants Gusman and Bordelon knew, must have known or should have known of this abandonment, yet they either ordered it or did nothing to prevent it, thereby deliberately exposing the plaintiffs to danger and acting with conscious disregard for the rights, safety, security and wellbeing of the plaintiffs and other persons held in that facility.

54.    Plaintiffs were trapped inside the locked facility and unable to escape the rising flood waters approaching two and a half feet.  At this time plaintiffs believed that they had been left to die.

55.    For three days, from Monday, August 27, 2005, until Thursday, September 1, 2005, Plaintiffs experienced a special version of hell on earth, as they were locked inside the OPP without food, water, toilet facilities or security and no access to the outside world.

56.    During this time, essential services of plumbing and electricity were shut down.  Plaintiffs were exposed to raw sewage and other contaminants contained in the flood waters.  Plaintiffs were entombed without lights, with no air circulation and in intense heat.

57.    While trapped inside the prison, plaintiffs, although arrested only for a minor municipal offense, were held with inmates already convicted of various offenses, including serious and violent crimes.

17

58.     During this time, plaintiffs believed they would not survive the ordeal.   In addition to their own physical and mental torment, they suffered severe mental and emotional pain and distress at not being able to communicate, perhaps for the last time, with their families.

59.     During this time, plaintiffs were witnesses to numerous acts of desperation by the inmates.  Windows and walls were broken and fires were set to blankets and shirts which were thrown out the windows to alert rescue personnel.  Signs were placed in the windows pleading for help.

60.     On Thursday, September 1, 2005, some deputies returned and plaintiffs were taken back down to the flooded first floor of the complex where they were confined in waist-deep contaminated water.   Plaintiff Paul Kunkel, having had no water for three days, was forced to drink from the polluted water in order to survive.

61.     After being in the standing water for several hours, plaintiffs were removed by boat to a highway overpass and placed in rows.  Plaintiffs remained on the overpass in 100-degree heat for over ten hours in the direct sun, still without being given food or water.

62.     During this time, plaintiffs suffered extreme disorientation, dehydration, severe emotional, physical and mental distress, and feared for their lives and safety.

63.     Plaintiffs were ordered to board buses to evacuate the City on the evening of September 1, 2005.

64.     Plaintiff Kunkel was taken to Hunt Correctional Center and placed outside in a prison exercise yard with thousands of other displaced arrestees and convicted prisoners.

65.     Plaintiff Kunkel, a pretrial detainee held on a minor municipal charge, was kept with convicted criminals some of whom were death row inmates.  Approximately 4000 prisoners were locked inside the exercise yard.

66.     Plaintiff Kunkel was kept outside five days in the exercise yard, forced to sleep on the grass, without protection or shelter exposed to the elements and horrific scenes around him. He struggled to obtain limited food and water.

67.     Plaintiff Kunkel was without toilet facilities during this time and was forced to urinate and defecate in the open, which was a humiliating and frightening experience.

68.     During the ordeal of his confinement, plaintiff Kunkel developed an eye infection.  As a result of this eye infection, Plaintiff Kunkel was effectively rendered blind during his detention, which exacerbated his extreme emotional and mental distress.  He received no medical treatment for this condition despite request, until he was ultimately transferred to what he believes was Angola prison.

69.     Subsequently on or about September 5, 2005, plaintiff Kunkel was removed to a warehouse-type facility that according to his information and belief was called Angola.  This facility was equipped with sinks but no toilets.  Outhouses were adjacent to the warehouse. As a result plaintiff Kunkel was subjected to unsanitary conditions. Plaintiff Kunkel was held an additional 28 days before his eventual release on October 3,

2005. During this time he was housed with convicted criminals some of who were death row inmates.

70.    When plaintiff Kunkel was admitted to the custody of the OPCSO he disclosed that he was under a physicians' care and took prescribed medications for various serious medical conditions.  Despite request plaintiff Kunkel never received his medication the entire time while he was in the custody of the OPCSO.  The absence of the prescribed medication aggravated plaintiff Kunkel's injuries during this ordeal.

71.    Plaintiff Waganfeald was removed from the overpass on September 1, 2005 and taken to Catahoula Correctional Facility ("Catahoula").

72.    While at Catahoula, plaintiff Waganfeald, a pretrial detainee charged only with a minor municipal charge, was housed with persons convicted of serious, some violent, crimes.

73.    While at Catahoula plaintiff Waganfeald was allowed to make a 10-second phone call to quickly inform the recipient of the telephone policies.  This was the first phone call plaintiff Waganfeald had been allowed to make since he had been taken into custody and was the first time Waganfeald's family and friends were able to hear from him.

74.    Plaintiff Waganfeald was released from Catahoula Correctional Facility on October 5, 2005.

75.    To the plaintiffs' knowledge and belief, the municipal charges against them have been dropped.

76.     In addition to other injuries and damages set forth herein, the plaintiffs incurred expenses for attorneys fees and costs, medical expenses and lost wages as a result of the actions of the defendants as described herein.

### V. CAUSES OF ACTION

77.     Plaintiffs repeat the allegations contained in Paragraphs 1 – 75 as if fully rewritten.

78.     The actions of the defendants NOPD Officers John Doe 1, John Doe 2, NOPD Sgt. John Doe, Lt. John Doe and Capt. Kevin Anderson, resulting in the false arrest and imprisonment of plaintiffs, violated the rights of plaintiffs as guaranteed under the First, Fourth, Ninth and Fourteenth Amendments to the U.S. Constitution to privacy, to liberty, to be left alone, to locomotion, to travel, to due process, equal protection, privileges and immunities, and the right to be free from unreasonable search and seizure in violation of 42 USC 1983.

79.     These defendants, acting together and under color of law, reached an understanding, engaged in a course of conduct and otherwise conspired among themselves to commit those acts described herein and to deprive plaintiffs of their rights as described herein.

80.     Defendants City of New Orleans, Nagin, Compass, Anderson, Lt. Doe, and Sgt. Doe had knowledge of the wrongs done and conspired to be done as described herein, had the power to prevent or aid in the prevention of same, yet failed or refused to do so in violation of 42 USC 1983.

81.    The defendant City of New Orleans established, condoned and encouraged policies, practices, procedures and customs that directly and proximately caused the deprivation of the civil and constitutional rights of the Plaintiffs as alleged herein. Included among these are the following:

a) Failure to insure that municipal laws regarding public intoxication are properly and lawfully enforced and that persons are not wrongfully arrested and imprisoned on false charges of public intoxication;

b) Failure to insure that evidence in cases involving allegations of public intoxication is preserved and maintained, including but not limited to taking appropriate and reasonable measures to obtain and preserve physical evidence of said alleged intoxication;

c) Failure to provide for use of procedures in lieu of arrest for dealing with pedestrians who may appear to be intoxicated in public, in particular in a city which encourages, condones and permits drinking of alcoholic beverages in public places;

d)  Failure to provide night and/or weekend court proceedings so that persons arrested on municipal and/or traffic charges without a warrant would have a probable cause determination within 48 hours of arrest;

e) Failure to implement clear and lawful standards, policies and procedures to insure that persons arrested on municipal and/or traffic charges without a warrant who do not appear before an impartial magistrate within 48 hours of arrest are released from custody;

22

f)  Failure to implement clear and lawful standards, policies and procedures to insure that persons arrested on  municipal and/or traffic charges who do not appear before an impartial magistrate within 72 hours for determination of bail and counsel, are released from custody;

g)  Failure to properly screen before hiring and failure to properly supervise, discipline, train or control police officers and supervisors, including the defendant NOPD officers and supervisors;

h)  Failure to have adequate or reasonable plans and failure to implement those plans to protect the rights, safety and well-being of persons in custody charged with minor municipal offenses during a situation where a hurricane, in particular a potentially serious and/or devastating hurricane, is threatening the City of New Orleans and its residents and visitors;

i)  Failure to release from custody those persons charged with minor municipal offenses when it is apparent that without release, those persons rights to access to the courts, counsel and bail will be violated, especially in a situation where a hurricane, in particular a potentially serious and/or devastating hurricane, is threatening the City of New Orleans and its residents and visitors;

82.    The actions of defendants City of New Orleans, Nagin, Gusman, Hunter and Bordelon, resulting in the false imprisonment of plaintiffs and their confinement in an unsafe, insecure and inhumane environment, violated the rights of plaintiffs as guaranteed under the First, Fourth, Sixth, Eighth, Ninth and Fourteenth Amendments to

the U.S. Constitution to privacy, to liberty, to be left alone, to locomotion, to travel, to due process, equal protection, privileges and immunities, access to the courts, access to counsel, access to bail, the right to be free from unreasonable search and seizure, the right of persons held in custody to adequate medical care for serious medical needs, and the right to be free from cruel and inhumane conditions of confinement, in violation of 42 USC 1983.

83.    These defendants, acting together and under color of law, reached an understanding, engaged in a course of conduct and otherwise conspired among themselves to commit those acts described herein and to deprive plaintiffs of their rights as described herein.

84.    Defendants City of New Orleans, Nagin, Gusman, Hunter and Bordelon had knowledge of the wrongs done and conspired to be done as described herein, had the power to prevent or aid in the prevention of same, yet failed or refused to do so in violation of 42 USC 1983.

85.    The Defendant Sheriff Gusman established, condoned and encouraged policies, practices, procedures and customs that directly and proximately caused the deprivation of the civil and constitutional rights of the Plaintiffs as alleged herein. Included among these are the following:

   a)  Failure to implement clear and lawful standards, policies and procedures to insure that persons arrested on municipal and/or traffic charges without a warrant who do not have an impartial magistrate determine probable cause within 48 hours of arrest are released from custody;

24

b) Failure to implement clear and lawful standards, policies and procedures to insure that persons arrested on  municipal and/or traffic charges who do not appear before an impartial magistrate within 72 hours of arrest for determination of bail and counsel, are released from custody;

c) Failure to have adequate or reasonable plans and failure to implement those plans to protect the rights, safety and well-being of persons in custody charged with minor municipal offenses during a situation where a hurricane, in particular a potentially serious and/or devastating hurricane, is threatening the City of New Orleans and its residents and visitors;

d) Failure to release from custody those persons charged with minor municipal offenses when it is apparent that without release, those persons rights to access to the courts, counsel and bail will be violated, especially in a situation where a hurricane, in particular a potentially serious and/or devastating hurricane, is threatening the City of New Orleans and its residents and visitors;

e) Failure to properly screen before hiring and failing to properly supervise, discipline, train or control deputies and supervisors, including the defendant deputies, wardens and supervisors, regarding the rights of persons arrested without a warrant to prompt judicial determination of probable cause, the rights of arrested persons to access to telephones, bail, counsel and the courts, and the rights of arrested persons to be held in safe, secure and humane conditions.

86.     The acts, omissions, systematic flaws, policies, practices, procedures and customs of the defendants as described herein, fostered an environment wherein laws, rules and regulations, including but not limited to laws governing warrantless arrest, detention policies and disaster preparedness plans, were not adhered to and were disregarded, with the foreseeable result that violations of the constitutional and civil rights of persons detained at the Orleans Parish jail, including the plaintiffs, would occur.  Such practices constitute an arbitrary use of government power, and are evidence of a callous and reckless disregard for the civil and constitutional rights of residents and visitors to the City of New Orleans, including plaintiffs.

87.     The acts and omissions of the Defendants as described herein were done with deliberate indifference to the civil and constitutional rights of the plaintiffs.

88.     The Defendants acted maliciously, wantonly and in reckless disregard of the plaintiffs' rights.

89.     The acts and omissions of the Defendants and their employees and assigns, as described herein, were also done with negligence and gross negligence,  in violation of Louisiana statutory and constitutional law and constituted false arrest, false imprisonment, intentional infliction of emotional distress, and violation of the plaintiffs' rights to privacy, to liberty, to be left alone, to locomotion, to travel, to due process, equal protection, access to the courts, counsel and bail,  the right to be free from unreasonable search and seizure  and the right to be free from cruel and inhumane conditions of confinement, as well as rights guaranteed under  La. Code of Criminal Procedure Art. 230.1 and  Art. 230.2.

90.     The Defendants City of New Orleans and Sheriff Gusman negligently hired, retained, supervised, failed to discipline and entrusted their respective employees in violation of Louisiana law.

91.     The Defendants are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of encouraging, aiding, abetting, committing, and/or ratifying or condoning the commission, of the above described acts and/or omissions.

92.     The Defendants owed duties to the plaintiffs which they breached in the manner described herein.

93.     The actions of the Defendants as described herein, were the proximate cause of the injuries and damages suffered by the plaintiffs.

## VI. DAMAGES

94.     As a result of the actions of the Defendants as described above, the Plaintiffs, Robie J. Waganfeald and Paul W. Kunkel, Jr., have experienced serious physical, emotional  and mental distress, pain and suffering, loss of liberty, violation of their constitutional rights, economic loss, and incurred expenses for attorneys fees and costs and medical bills, among other damages.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that after due proceedings there be judgment rendered herein in favor of Plaintiffs and against the Defendants, jointly and severally, as follows:

a) Compensatory and punitive damages to Plaintiffs in an amount to be determined at trial.

b) Reasonable attorneys fees, all costs of these proceedings, and legal interest.

c) Such other relief as this Court deems just and proper

Respectfully submitted,

Mary E. Howell, LSBA# 07030
Attorney at Law
P.O. Box 19043
New Orleans LA 70179
Phone (504) 822 4455
Email: meh316@aol.com

Local Counsel for Plaintiffs

John T. Murray (Ohio Reg. 0008793)
Garnetta P. Moreland (Ohio Reg. 0076077)
Murray & Murray Co. L.P.A.
111 E. Shoreline Drive
P. O. Box 19
Sandusky, Ohio 44871-0019
Direct Dial (419) 624-3125
Phone (419) 624-3000
Fax (419) 624-0707
Email: jotm@murrayandmurray.com

John L. Huffman (Ohio Reg. 0039658)
Mickel & Huffman
520 Madison Ave., Suite 520
The Spitzer Building
Toledo, OH 43604-1351
Phone (419) 242-8461
Fax (419) 242-6866
Email: jhuff74035@aol.com

Daniel J. Maloney (Ohio Reg. 0069193)
Maloney McHugh & Kolodgy, Ltd.
20 North St. Clair
Toledo OH 43604
Phone (419) 241-5175
Fax (419) 725-2075
Email: dmaloney@mmklaw.net

Attorneys for Plaintiffs