# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT



United States Court of Appeals
Fifth Circuit

**F I L E D**

March 12, 2012

Lyle W. Cayce
Clerk

No. 11-30081

D.C. Docket No. 2:06-CV-5036

ROBIE J. WAGENFEALD; PAUL W. KUNKEL, JR.,

      Plaintiffs - Appellees

v.

MARLIN N. GUSMAN, Orleans Parish Criminal Sheriff; WILLIAM C. HUNTER, OPCSO Chief Deputy,

      Defendants - Appellants

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before KING, JOLLY and WIENER, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is reversed, vacated and the cause is remanded to the District Court with instructions to enter judgment in favor of Gusman and Hunter on all claims asserted by Appellees.

IT IS FURTHER ORDERED that plaintiffs-appellees pay to defendants-appellants the costs on appeal to be taxed b the Clerk of this Court.

ISSUED AS MANDATE: 30 APR 2012

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _____
Deputy

New Orleans, Louisiana     30 APR 2012

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 12, 2012

No. 11-30081

Lyle W. Cayce
Clerk

ROBIE J. WAGANFEALD; PAUL W. KUNKEL, JR.,

Plaintiffs-Appellees

v.

MARLIN N. GUSMAN, Orleans Parish Criminal Sheriff; WILLIAM C. HUNTER, OPCSO Chief Deputy,

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, JOLLY, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiffs-Appellees Robie J. Waganfeald and Paul W. Kunkel, Jr. (collectively, "Appellees") filed this action against several defendants, including Defendants-Appellants Marlin N. Gusman, Orleans Parish Criminal Sheriff, and William C. Hunter, Orleans Parish Criminal Sheriff's Office Chief Deputy (collectively, "Appellants"), under 42 U.S.C. § 1983 for violations of their Fourth, Sixth, and Eighth Amendment rights. The Appellees also brought a false imprisonment claim against the Appellants under Louisiana law. Appellees' claims arise out of their incarceration in New Orleans at and around the time that Hurricane Katrina struck the city. After trial, a jury found that Appellants

were not liable for some of those claims, but (1) held Gusman liable for falsely imprisoning Appellees, and (2) held Hunter liable for denying Appellees' purported Sixth Amendment right to use a telephone following their arrest. We reverse the jury's verdict as to both claims for which Appellants were held liable.

## I. Facts & Proceedings

### A. Facts

The facts of this case are largely undisputed. On the evening of Friday, August 26, 2005, Appellees, traveling by car from Houston, Texas to Toledo, Ohio, stopped for the night in New Orleans. They checked into a hotel, then proceeded to the French Quarter, some time after 1:00 a.m. on the morning of August 27, and remained there for approximately four hours, consuming several beers each. At approximately 5:00 a.m., two New Orleans police officers placed Appellees under arrest for public intoxication under New Orleans Municipal Code § 54-405. Appellees assert that they were not intoxicated when the arrests took place, but instead that Kunkel fell to the ground when his bad knee gave out as he stepped off a curb, and that Waganfeald was attempting to help Kunkel to his feet.

At the time of the arrests, Hurricane Katrina was in the Gulf of Mexico and was estimated to make landfall on Monday morning. For several days prior to Katrina's estimated landfall, Gusman and his staff prepared the Orleans Parish Prison ("OPP") to weather the storm with all staff and all prisoners—an average daily population of 5,800—remaining inside the complex. At that time, OPP comprised eleven main facilities which held inmates, as well as ancillary buildings. In the event of serious flooding, Gusman's plan called for staff and prisoners to "vertically evacuate" to the upper floors of the OPP facilities. On the morning of Sunday, August 28, a mandatory evacuation order was issued for

Case 2:06-cv-05036-MVL-KWR   Document 123   Filed 05/02/12   Page 4 of 17

No. 11-30081

residents of New Orleans, but that order did not apply to OPP staff and prisoners.

Appellees' arresting officers took them to the Intake and Processing Center ("IPC") at OPP, at which point Appellees' money, valuables, and cell phones were confiscated. Appellees were not given an opportunity to make bail, but instead were placed in the Templeman III facility at OPP, which could house as many as 1,200 pre-trial detainees. At the time, Gusman was in charge of OPP, Hunter directed prison operations, and Warden Gary Bordelon oversaw Templeman III.

Normally, a number of telephones–both free and collect–were available for inmate use in the IPC. Collect telephones were also available in the Templeman III building. For security reasons, cell phones were not allowed in the prison complex. After being booked, Appellees attempted to make phone calls using the IPC telephones, but soon discovered that they were not working. That Saturday, Hunter, who was responsible for the phone system, became aware that all of the telephones at OPP were inoperable. Hunter instructed the telephone supervisor, Donald Hancock, to report to the prison. Hancock examined the system that day and determined that the telephone service provider's lines were overloaded. Because the problem was not with the OPP telephones themselves, prison officials were unable to remedy the problem. Hancock reported his findings to Hunter at some point that weekend. Sheriff Gusman testified that he was not made aware of the problem with the phones. Gusman further testified that, in theory, he or Hunter could have allowed the inmates to use their cell phones, but Gusman emphasized that prison policy forbids cell phone use (even by most deputies) because of security risks. OPP phones remained inoperable throughout the weekend, and Appellees were unable to make any phone calls during that time.

After being booked, Appellees were placed in separate cells in Templeman III, where they remained as Hurricane Katrina approached and then hit New

Orleans at approximately 6:00 AM on Monday, August 29, 2005. Initially, OPP officials believed that the complex had weathered the storm unscathed. After the levees were breached and the city flooded, however, the prison's generators stopped working, and its water and food supplies were contaminated. As floodwater entered the Templeman III building, officers evacuated inmates to higher floors. Appellees experienced insufferable conditions as the water rose in their cells. Kunkel was locked in his cell until Wednesday evening; Waganfeald was moved to a miniature gymnasium within OPP. Both Kunkel and Waganfeald went without food and water for approximately three days. The temperature was very high; there was no air circulation; the toilets did not flush. In the midst of this chaos, Appellees believed that the prison guards had abandoned them, and they had no way of making contact with the outside world. Both men believed that they might die.

Appellees were finally moved from OPP on Wednesday, August 31, but this did not mark the end of their ordeals. They were taken by boat to a highway overpass, where they, along with thousands of other inmates, continued to endure heat, hunger, and thirst. Appellees were then placed on buses and transported out of New Orleans. For about a month, Kunkel endured further deplorable conditions, first at Louisiana's Hunt Correctional Institute, and then at the Louisiana State Penitentiary at Angola, before being released on October 3, 2005. Waganfeald was taken to Cathoula Parish Prison and was released on October 5, 2005. Other than an eye infection for which Kunkel received treatment at Angola, Appellees did not suffer physical injuries, but both men have reported psychological trauma as a result of these experiences.

## B. Proceedings

Appellees filed suit on August 28, 2006, asserting claims under 42 U.S.C. § 1983 for violations of, *inter alia*, the Fourth Amendment (based on their

No. 11-30081

allegedly unlawful detention), the Sixth Amendment (based on their inability to contact counsel by telephone), and the Eighth Amendment (based on their conditions of confinement). Their complaint also asserted claims for false imprisonment under Louisiana law. The named defendants included Gusman, individually and in his official capacity as Criminal Sheriff of Orleans Parish; Hunter, individually and in his official capacity as Chief Deputy Criminal Sheriff of Orleans Parish; Bordelon, individually and in his official capacity as Warden of the Templeman III jail facility; various officers of the New Orleans Police Department; the City of New Orleans; and Mayor C. Ray Nagin.

Appellees proceeded to trial against Gusman, Hunter, and Bordelon. On October 14, 2010, the jury found Gusman liable for false imprisonment and awarded compensatory damages of $200,000 to Waganfeald and $259,300 to Kunkel. The jury found, however, that Gusman was not liable for the Fourth, Sixth, and Eighth Amendment claims. The jury also rejected the claims against Gusman in this official capacity, finding that his official policies were not the moving force behind any violation of Appellees' constitutional rights. Additionally, the jury found Hunter liable for violating the Appellees' Sixth Amendment right to counsel, denied qualified immunity to Hunter, and awarded each Appellee $100,000 for these violations. The jury rejected the remaining claims against Hunter, and it exonerated Bordelon on all claims. The district court then entered judgment later that month.

At the close of Appellees' case and at the close of evidence, Appellants orally moved for judgment as a matter of law. The district court denied each motion. After the jury verdict was announced, Appellants moved for judgment as a matter of law, or, in the alternative, a new trial. The district court denied both motions, and Appellants timely appealed.

No. 11-30081

## II. Standard of Review

With regard to issues that were preserved in the district court, we review its denial of judgment as a matter of law *de novo*, applying the same standard as the district court.[1] Judgment as a matter of law is proper "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]"[2] "[W]e will uphold a jury verdict unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary."[3] Further, we must review the evidence in the light most favorable to the jury's determination, and we may not reweigh the evidence or substitute the jury's reasonable factual inferences for our own.[4]

## III. False Imprisonment Claim Against Gusman

The jury rejected all claims against Gusman relating to Appellees' conditions of confinement and their inability to make telephone calls. The jury found Gusman liable for false imprisonment, however, which under Louisiana law consists of two elements: "(1) detention of the person; and (2) the unlawfulness of the detention."[5] It is undisputed that Gusman detained the Appellees, and thus, the question at issue is whether that detention was unlawful.

---

[1] *Julian v. City of Houston*, 314 F.3d 721, 725 (5th Cir. 2002).

[2] Fed. R. Civ. P. 50(a)(1).

[3] *Cousin v. Trans Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001).

[4] *Id.*

[5] *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d 669, 690 (La. 2006).

6

No. 11-30081

The only basis urged by Appellees that their detention was unlawful is Gusman's failure to release them when they were not granted a probable cause determination within 48 hours after their arrest. Under Louisiana law, a person who is arrested and in custody is "entitled to a determination of probable cause within forty-eight hours of arrest."[6] If such a determination is not timely made, "the arrested person *shall* be released on his own recognizance."[7] This statute tracks the United States Supreme Court's decision in *County of Riverside v. McLaughlin*,[8] in which the Court held that a probable cause determination must generally be made within 48 hours to comply with the Fourth Amendment.[9] As Appellees were arrested at approximately 5:00 a.m. on Saturday, August 27, 2005, this 48-hour period expired at 5:00 a.m. on Monday, August 29–just as Hurricane Katrina struck the Gulf Coast. Appellees had received no probable cause determination as of that Monday morning, but Gusman continued to detain them.

Appellees insist that the 48-hour rule permits no exceptions, but the United States and Louisiana Supreme Courts have indicated otherwise. In *Riverside*, the United States Supreme Court stated that if a probable cause determination is not made within 48 hours, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance."[10] Likewise, interpreting the relevant state statute, the Louisiana Supreme Court stated in *Louisiana v. Wallace*:

---

[6] La. Code Crim. Proc. art. 230.2(A).

[7] *Id.* art. 230.2(B)(1) (emphasis added).

[8] 500 U.S. 44, 56 (1991).

[9] *See Louisiana v. Wallace*, 25 So.3d 720, 723-24 (La. 2009) (Louisiana statute codified *Riverside*).

[10] *Id.* at 57.

> In the absence of a bona fide emergency or other extreme circumstances, all persons arrested without a warrant for whom a probable cause determination is not made within 48 hours must be immediately released from custody on their own recognizance.[11]

This statement constitutes dicta, as *Wallace* did not involve an emergency, but it nonetheless demonstrates that the Louisiana Supreme Court recognizes an emergency exception to the 48-hour rule.[12] Notably, the emergency exception in *Wallace* is worded almost identically to the same exception in *Riverside*, the decision that led to the creation of the Louisiana statute in the first place. It is therefore plain that both the federal and the Louisiana 48-hour rules contain an emergency exception. This aligns with common sense, because adopting Appellees' position that the 48-hour rule permits absolutely no exception could lead to any number of absurd consequences. Thus, in determining whether Appellees' detention was unlawful, we apply the emergency exception to the 48-hour requirement.

Gusman maintains that his detention of Appellees falls within this emergency exception. He also contends that he is immune from liability for false imprisonment under Louisiana's discretionary immunity statute.[13] Appellees counter the latter point by claiming that Gusman waived his discretionary immunity defense in the trial court and cannot raise it on appeal. In particular, Appellees note that although Gusman raised discretionary immunity in his answer and in his post-verdict Rule 50(b) and Rule 59 motions, he failed to raise

---

[11] 25 So.3d at 727.

[12] *See Hulin v. Fibreboard Corp.*, 178 F.3d 316, 328 (5th Cir. 1999) ("A federal court has a duty to determine state law as it believes the State's highest court would.").

[13] La. Rev. Stat. Ann. § 2798.1 ("Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.").

the issue in the pre-trial order or in his Rule 50(a) motion for judgment as a matter of law.[14] Appellees themselves may have waived this waiver argument by failing to raise it in opposition to Gusman's Rule 50(b) motion,[15] but we do not reach that issue, or the discretionary immunity argument at all. Rather, we reverse the jury's verdict on the simpler and more direct ground that Gusman's actions fall within the emergency exception to the 48-hour rule.[16]

The undisputed evidence in this case compels the conclusion that Hurricane Katrina was a bona fide emergency within the meaning of the emergency exception to the 48-hour rule. Indeed, if Katrina was not an emergency, it is difficult to imagine any set of facts that would fit that description. As the storm bore down on New Orleans, Gusman and his officers had to provide for the security and safety of approximately 5,800 of their own inmates, plus 130 more inmates who were transferred from St. Bernard Parish.[17] The officers planned to evacuate inmates vertically in the Templeman III

---

[14] See Maryland Cas. Co. v. Acceptance Indem. Ins. Co., 639 F.3d 701, 707-08 (5th Cir. 2011) (when a party fails to raise an issue in a Rule 50(a) motion, it waives the right to raise that issue in a Rule 50(b) motion).

[15] See Thompson and Wallace of Memphis, Inc. v. Falconwood Corp., 100 F.3d 429, 435 (5th Cir. 1996) (holding that when the party opposing the Rule 50(b) motion "did not raise the waiver bar in opposing the [R]ule 50(b) motion, they may not raise that bar on appeal"); see also Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 661 n.20 (11th Cir. 1993) (noting that even if the defendant waived a particular defense by failing to include it in the pre-trial order, the plaintiffs waived that waiver by failing to make the waiver argument in front of the district court); but see Scribner v. Dillard, 141 F. App'x 240, 243 (5th Cir. 2005) (unpublished) (holding that "waiver of waiver" per Thompson does not apply when defendants failed to raise defense, not only in Rule 50(a) motion, but at any time prior to the verdict; the defense was therefore considered waived).

[16] The emergency exception presents no waiver issue: Gusman raised the exception in the pre-trial order, the district court instructed the jury on it, and Gusman presses the issue on appeal.

[17] See La. Rev. Stat. Ann. § 15:706(c) ("The sheriff of the parish to which the prisoner is conveyed shall keep the prisoner safe and secure").

No. 11-30081

building to higher floors, if necessary. They also stockpiled food and water in the Templeman III building—on the first floor, unfortunately.

OPP initially survived the storm without flooding, but this changed rapidly after the levees were breached. The water rising on the first floor of Templeman III quickly reached waist level, the generator went out, and food and water supplies were contaminated. The electronic system for controlling the cell doors ceased to function, and officers had to open the doors manually, which—for some cells on the first floor—required the officers to dive into the water to manipulate the locking mechanism. The temperature grew very hot, and the officers allowed the inmates to break windows for purposes of air ventilation. The officers worked for many hours with inadequate food, water, and sleep. After the arduous process of evacuating the inmates was completed, the officers continued working to evacuate other individuals who were stranded in the neighborhood. In light of this clear emergency, we hold that the 48-hour rule was suspended. Consequently, Gusman did not falsely imprison the Appellees by holding them without a probable cause determination rather than releasing them into the teeth of the storm on the morning of August 29, 2005.

Appellees contend that they would not have received a probable cause determination within 48 hours of their arrest even in the absence of Hurricane Katrina, because the Municipal Courts did not operate on the weekends at that time. The jury, however, answered "No" to the following interrogatory:

> Do you find by a preponderance of the evidence that Sheriff Marlin Gusman, in his capacity as the Criminal Sheriff of Orleans Parish, had a policy, practice, or custom of deliberate indifference to arrested individuals' right to have a probable cause determination made by an impartial judge or magistrate within 48 hours of an arrest made without a warrant that was the moving force behind a violation of [Appellees'] constitutional rights?

If Gusman had a general policy of detaining individuals beyond 48 hours without a probable cause hearing, even in the absence of an emergency, that interrogatory would have to have been answered in the affirmative. In that situation, the municipal policy would certainly have been "adopted with 'deliberate indifference' to its known or obvious consequences."[18] Further, the municipal policy would be the "'moving force' behind the constitutional violation,"[19] as there would unquestionably have been a "direct causal link"[20] between Gusman's policy and the violation of the 48-hour rule. But, as the jury answered "No," and Appellees have not appealed that factual finding, they cannot rely on Gusman's purported policy of violating the 48-hour rule even in non-emergency conditions.

Gusman's detention of Appellees was not unlawful because his actions fell within the emergency exception to the 48-hour rule. Thus, we must reverse the district court's denial of Gusman's motion for judgment as a matter of law. We thus do not reach Gusman's additional argument that the jury's verdict was internally inconsistent.

## IV. Sixth Amendment Claim Against Hunter

The jury found that Chief Deputy Hunter acted in a manner that was deliberately indifferent to Appellees' asserted Sixth Amendment right to use a telephone to contact "an attorney and/or family and friends" following their arrest. The jury also rejected Hunter's defense of qualified immunity. On appeal, Hunter contends that the district court erred by denying him qualified immunity because (1) there was no violation of Appellees' Sixth Amendment

---

[18] *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998).

[19] *Id.*

[20] *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001).

No. 11-30081

right to counsel because that right never attached, no "critical stage" of the proceedings was reached, and Hunter did not act intentionally; and (2) even if there were such a violation, it had not been clearly established that refusing to allow pre-trial detainees to use cell phones when land lines are disrupted in an emergency violates the Sixth Amendment.

"A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."[21] A defendant violates clearly established law only if "the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[22] For a legal principle to be clearly established, "we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity"[23] and that places the statutory or constitutional question "beyond debate."[24]

When a defendant asserts qualified immunity, the plaintiff has the burden of proving that it is inapplicable.[25] Qualified immunity should be adjudicated "at the earliest possible stage in litigation,"[26] but "if the issue is not decided until trial the defense goes to the jury which must then determine the objective legal

---

[21] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011).

[22] *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (internal brackets and quotation marks omitted).

[23] *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011).

[24] *al-Kidd*, 131 S.Ct. at 2083.

[25] *Atteberry v. Nocona General Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005).

[26] *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

No. 11-30081

reasonableness of the officers' conduct."[27]  We have discretion to decide which prong of the qualified immunity analysis to address first.[28]

As a preliminary matter, Appellees contend that Hunter has waived qualified immunity.  Hunter raised qualified immunity generally in his answer and proposed jury instructions, the district court instructed the jury on qualified immunity, and the jury found that Hunter's actions were not objectively reasonable in light of Appellees' constitutional rights.  Hunter did not raise qualified immunity in his pre-verdict motions for judgment as a matter of law under Rule 50(a),[29] but he did in his post-verdict motion for judgment as a matter of law under Rule 50(b).  In response to Hunter's Rule 50(b) motion, Appellees did not counter that Hunter waived qualified immunity but instead responded to the merits of that issue.  Thus, Appellees have waived their waiver argument.[30]

Appellees also contend that even if Hunter has not waived qualified immunity generally, he has waived his specific contentions that Appellees' Sixth Amendment right to counsel never attached and that no "critical stage" of the proceedings was reached.  In lieu of addressing this specific waiver argument, we hold that even if Appellees had a Sixth Amendment right to counsel during the period in question, Hunter did not act in an objectively unreasonable manner in light of clearly established law, so the district court should have granted him judgment as a matter of law on qualified immunity.

---

[27] *McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000).

[28] *Morgan*, 659 F.3d at 371 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[29] FED. R. CIV. P. 50(a).

[30] *See Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir. 1996) (waiver of waiver).

No. 11-30081

There is no dispute that, during the period in question, telephones were made available to Appellees, but that it was not possible to place calls on these or any telephones at the facility. Donald Hancock, the telephone supervisor for the Orleans Parish Criminal Sheriff's Office, testified that on the Saturday before Hurricane Katrina made landfall, calls could not be placed from OPP because the telephone service provider's lines were overloaded. He testified further that because the problem was external, and the OPP telephones themselves were functioning properly, there was nothing he could have done to remedy the problem. Hancock timely reported his findings to Hunter and evacuated New Orleans that Sunday morning. When Hancock and Hunter spoke again later that day, Hunter asked Hancock to return and continue working on the phones, but Hancock again informed Hunter that the problem was external and that there was nothing he could do.

Appellees contend that in this situation, Hunter should have allowed them to use their cell phones to make calls. In accordance with standard procedures, Appellees' cell phones had been confiscated when they were booked into the prison. As noted, Gusman testified that inmates are not allowed to possess cell phones because that would pose a "security risk." He went on to explain that allowing the use of cell phones would impair prison officials' ability to record inmates' calls, which is important because "inmates either make threatening phone calls or try to continue their illegal activity while in jail." Gusman also stated that, for security reasons, even deputies are generally not allowed to carry cell phones while on duty. Gusman testified that he was completely unaware of the problems with the OPP telephone system during the period in question, but he acknowledged that Hunter would have had the authority to allow prisoners to use their cell phones.

There is no particularized, clearly established law which would have instructed Hunter that, under the Sixth Amendment, he had to allow pre-trial

14

No. 11-30081

detainees to use their cell phones when land lines were disrupted. Appellees have pointed us to no such authority, and we have found none. To the contrary, we have ruled that prisoners have "no right to unlimited telephone use."[31] Other courts have observed that "a prisoner's right to telephone access is subject to rational limitations in the face of legitimate security interests of the penal institution."[32] As a general matter, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."[33] Thus, prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."[34]

In this case, Hunter faced the security risks that would generally follow from allowing prisoners to use cell phones, which were exacerbated by the emergency conditions that were present during the approach, landfall, and aftermath of Katrina. Inmates were unable to use the land-line telephones in the OPP not because of any action that Hunter took, but because of overloaded external lines, a situation beyond any control of law enforcement. Distributing

---

[31] *Lopez v. Reyes*, 692 F.2d 15, 17 (5th Cir. 1982).

[32] *Douglas v. Gusman*, 567 F.Supp.2d 877, 886 (E.D.La. 2008) (quoting *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir.1994)); *see also Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir. 1989) (same).

[33] *Bell v. Wolfish*, 441 U.S. 520, 546 (1979).

[34] *Id.* at 547; *see also id.* (security considerations "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.") (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)); *Whitley v. Albers*, 475 U.S. 312, 322 (1986) ("prophylactic" prison security measures are entitled to deference, even if there exist "arguably superior alternatives").

cell phones to approximately 5,930 inmates, or even just the 1,200 pre-trial detainees in Templeman III, would have been a creative and potentially beneficial option, but it would also have added to prison officials' unprecedented logistical burden as well as the potential security risks.  Before Hurricane Katrina struck, prison officials had no reason to assume that the telephone lines would be overloaded for a significant length of time; after the prison flooded, they were overwhelmed with more urgent emergency tasks. The unprecedented emergency conditions would also have made it very difficult if not impossible for any counsel that Appellees might have reached to provide meaningful assistance.  We do not suggest (or deny) that there is a blanket emergency exception to the Sixth Amendment right to counsel.  Rather, we hold only that in light of the security risks and unique emergency conditions he faced, Hunter did not act in an objectively unreasonable manner under clearly established law. The district court therefore erred by not granting Hunter qualified immunity as a matter of law.

## V. Conclusion

There is no doubt that Appellees suffered terribly while held in custody after Hurricane Katrina struck New Orleans.  It is equally clear, however, that (1) Gusman's failure to release Appellees falls within the emergency exception to the rule that a probable cause determination must be made within 48 hours, and (2) Hunter's failure to allow Appellees to use cell phones was not objectively unreasonable in light of any clearly established law.  We therefore reverse and vacate the judgment of the district court, and remand with instructions to enter judgment in favor of Gusman and Hunter on all claims asserted by Appellees.

REVERSED, VACATED, and REMANDED WITH INSTRUCTIONS.